**VESTURE CORPORATION, Plaintiff and Counterclaim Defendant,**

v.

**THERMAL SOLUTIONS, INC.; and Cooktek, Inc., Defendants and Counterclaim Plaintiffs.**

No. CIV.1:01 CV 01006.

United States District Court, M.D. North Carolina.

Sept. 16, 2003.

Christopher G. Daniel, Charles A. Burke, Womble, Carlyle, Sandridge & Rice, Winston-Salem, NC, Alan W. Kowalchyk, Jeffrey C. Brown, John M. Berns, Mark D. Schuman, Earl D. Reiland, Jeffrey C. Brown, Merchant & Gould, P.A., Minneapolis, MN, Jack Bremer Hicks, Womble, Carlyle, Sandridge & Rice, Pllc, Greensboro, NC, for Plaintiff and Counterclaim Defendant.

Mack Sperling, Brooks, Pierce, Mclendon, Humphrey & Leonard, Greensboro, NC, John M. Collins, Scott R. Brown, Hovey, Williams, Timmons & Collins, Kansas City, MO, for Defendants and Counterclaim Plaintiffs.

## *MEMORANDUM OPINION*

BULLOCK, District Judge.

## I. INTRODUCTION

This is a patent infringement case involving the technology of heated food delivery bags. Plaintiff Vesture Corporation ("Vesture") filed this declaratory action against Defendants Thermal Solutions, Inc. ("TSI") and Cooktek, Inc. (collectively "Defendants") asserting non-infringement of three patents: U.S. Patent Nos. 6,232,-585 ("the '585 patent"), 6,444,961 ("the '961 patent"), and 6,274,856 ("the '856 patent") (collectively "TSI's patents"). Vesture also alleged state law claims of tortious interference with prospective business relations and unfair and deceptive trade practices. Defendants answered and counterclaimed alleging infringement, contributory infringement, and inducement of infringement. In response, Vesture claimed that one or more of the claims of TSI's patents were invalid under 35 U.S.C. § 1 et seq., including without limitation, 35 U.S.C. §§ 102, 103, and/or 112. The court conducted a claims construction hearing on May 1, 2003. Presently before the court are Defendants' motion to dismiss all claims regarding the '856 patent, cross-motions for summary judgment regarding infringement of the '585 and '961 patents, and Defendants' motion for summary judgement regarding Vesture's tortious interference with prospective business relations and unfair and deceptive trade practices claims.

## II. BACKGROUND

Vesture is a North Carolina corporation with its principal place of business in Asheboro, North Carolina. TSI is a Kansas corporation with its principal place of business in Wichita, Kansas. Cooktek is an Illinois corporation with its principal place of business in Chicago, Illinois. Cooktek is the exclusive licensee within the field of products including food delivery systems under TSI's patents. TSI is the assignee of TSI's patents.

TSI's patents relate to a heated food delivery system. In the past, companies have used simple insulated bags to deliver food to consumers. More recently, however, companies have used newer heated food delivery systems. The first generation heated systems were "corded" units having an electrical cord and an internal electrical heating element. Each of TSI's patents is concerned with the newer generation of food delivery systems having specialized induction heating equipment which eliminates cords, heats quickly, and automatically controls bag temperature to a desired delivery temperature without any user input or control.

On May 19, 1999, Brian Clothier and Amil J. Ablah filed the application for the '585 patent with the United States Patent and Trademark Office ("PTO"). On September 27, 2000, the PTO issued an "Office Action" rejecting all pending claims, i.e., claims 17–28 and 34–38. Following an interview with the PTO examiner, a proposed Amendment was filed on January 26, 2001. On May 15, 2001, the PTO issued a Notice of Allowability.

On April 5, 2001, Clothier, Ablah, Robert E. Wolters, Jr., William W. Heine, and David E. May filed the application for the '961 patent. On September 13, 2001, the PTO issued an Office Action rejecting all pending claims except claims 37, 38, 44, and 45. In response, the applicants filed an Amendment on November 1, 2001, followed by Supplemental Amendments on November 14 and 16 and December 4, 2001, adding new claims. A Final Office Action was issued on February 26, 2002, allowing claims 37, 38, 44, 45 and 50–77 but rejecting all remaining claims. In response to this Office Action, applicants filed an Amendment on March 4, 2002, canceling the rejected claims. On September 3, 2002, the PTO issued a Notice of Allowability.

On June 29, 2000, Clothier and Ablah filed the application for the '856 patent. On January 10, 2001, the PTO issued an Office Action rejecting all pending claims, i.e., claims 1–22. In response to this Office Action, the applicants filed an Amendment on April 4, 2001. On April 18, 2001, the PTO issued a Notice of Allowability.

## III. DISCUSSION

### A. Subject Matter Jurisdiction for the '856 Patent

Vesture originally brought a declaratory action of non-infringement against Defendants over the '856 patent. Defendants answered and counterclaimed alleging that Vesture infringed the '856 patent. In response, Vesture asserted that numerous claims of the '856 patent were invalid. Both parties then engaged in prolonged discovery regarding the '856 patent. Subsequently, Defendants claim that they have decided not to assert any of the claims of the '856 patent against Vesture in this case. Supporting this, Defendants tendered an "unequivocal nonliability letter" to Vesture stating that Defendants will not assert at trial that Vesture's allegedly infringing product infringes the '856 patent. (Decl. of John M. Collins in Supp. Def.'s Mot. Dismiss All Claims Regarding U.S. Patent No. 6,274,856, Ex. 1).

Defendants claim that this letter coupled with their statement that they are not asserting the '856 patent against any of

Vesture's past or present commercialized products means that Vesture can have no reasonable apprehension of litigation. Thus, Defendants claim that this court is divested of subject matter jurisdiction under *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed.Cir.1995). Vesture distinguishes *Super Sack* and claims that this court should exercise its discretion and maintain jurisdiction over this claim.

■ Under Article III of the United States Constitution and by the terms of the Declaratory Judgments Act ("DJA"), 28 U.S.C. § 2201, the existence of an actual controversy is a predicate to federal subject matter jurisdiction over a claim. *Super Sack*, 57 F.3d at 1058. Furthermore, the actual controversy must continue at all times throughout the lawsuit, not only at the time the action was commenced. *See Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). "The long established rule of law is that a declaratory judgment plaintiff must establish an actual controversy on the 'totality of the circumstances.'" *Spectronics Corp. v. H.B. Fuller Co., Inc.*, 940 F.2d 631, 634 (Fed.Cir.1991) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 272, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). There are two requirements for jurisdiction to exist under the DJA, 28 U.S.C. § 2201:

> There must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

*BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed.Cir.1993).

In *Spectronics*, the Federal Circuit held that a "statement of non liability," which was filed with the court, operated to divest the district court of jurisdiction. 940 F.2d at 636. In a subsequent case, the Federal Circuit upheld the district court's dismissal of the plaintiff's declaratory judgment claim of non-infringement and invalidity for lack of a reasonable apprehension of a future infringement suit after the defendant, Super Sack, withdrew its infringement allegations and promised not to sue the plaintiff for infringement as to any claim of the patents-in-suit. *Super Sack*, 57 F.3d at 1058. On appeal, the plaintiff contended that an actual controversy still existed because Super Sack's promise was not contained in a covenant filed with the court and did not cover any products made or sold by the plaintiff in the future. The Federal Circuit first held that it was not necessary to file a *Spectronics*-type covenant with the court. *Id.* at 1059. Second, the court held that Super Sack's promise not to sue on the patent for any past or present conduct was more than sufficient to defeat any reasonable apprehension on behalf of the plaintiff of a future infringement suit due to its past or present conduct. *Id.* at 1059–60.

■ Like Super Sack, Defendants in this case have unconditionally promised not to sue for infringement on the '856 patent for any of Vesture's past or present products. Vesture argues, however, that the facts in *Super Sack* are distinguishable from the facts of this case. Vesture notes that the patent in *Super Sack* had already been found to be valid and that the dismissal of that claim rid the court of the entire case. In this case, Vesture contends that the validity of the '856 patent has yet to be determined and that its claims are nearly identical to those of the '585 and '961 patents. Thus, dismissing all claims as to the '856 patent would not preserve judicial economy nor be in the public interest. In fact, Vesture claims that dismissal would be a waste of

resources due to the thousands of documents produced, numerous experts retained and depositions taken, and substantial expense incurred by Vesture. Accordingly, Vesture claims it would suffer significant prejudice if the court does not retain jurisdiction.

Although the facts may be somewhat different, the court finds *Super Sack* controlling. As a result of Defendants' unequivocal statements of nonliability to Vesture, there is no actual controversy regarding the '856 patent. Though Vesture may still question the validity of the '856 patent, this is not enough to create a justiciable case or controversy. *See id.* at 1060. Furthermore, judicial economy is not a concern as the court has already expended a tremendous amount of effort attempting to educate itself and understand the voluminous amounts of pleadings, exhibits, and testimony from both parties concerning these matters. Finally, Vesture's claims about the motives behind Defendants' withdrawal and about the possibility that Defendants may bring claims against others under the '856 patent in the future are simply too speculative to create an actual case or controversy. "The residual possibility of a future infringement suit based on [a defendant's] future acts is simply too speculative a basis for jurisdiction over [a claim for declaratory judgment]." *Id.* As the Federal Circuit has previously upheld, it is appropriate for a court to dismiss counterclaims related to fewer than all claims in a patent infringement action. *See Grain Processing Corp. v. American Maize–Products Co.,* 840 F.2d 902 (Fed.Cir.1988). Thus, the court has no subject matter jurisdiction to render judgment regarding the '856 patent and must dismiss all claims accordingly.

## B. Summary Judgment Standard

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may survive a motion for summary judgment by producing "evidence from which a [fact finder] might return a verdict in [its] favor." *Anderson v. Liberty Lobby,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the motion is supported by affidavits, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R.Civ.P. 56(e); *see also Cray Communications, Inc. v. Novatel Computer Sys., Inc.,* 33 F.3d 390, 393–94 (4th Cir.1994) (moving party on summary judgment motion can simply argue the absence of evidence by which the non-movant can prove its case). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [fact finder] could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

The fact that the lawsuit involves a non-infringement analysis does not render this case unsuitable for summary judgment. Summary judgment is "as appropriate in a patent case as any other" case under Rule 56(c). *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,* 853 F.2d 1557, 1561 (Fed.Cir. 1988). The Federal Court has advised, "[w]here no issue of material fact is present ... courts should not hesitate to avoid an unnecessary trial by proceeding under Fed.R.Civ.P. 56 without regard to the particular type of suit involved." *Chore–Time Equip., Inc. v. Cumberland Corp.,* 713 F.2d 774, 778–79 (Fed.Cir.1983). It is with these tenets in mind that the Court consid-

ers Defendants' motions and Vesture's cross-motion for summary judgment.

## C. Claim Construction

### 1. Legal Principles

In a patent infringement case, the court's analysis requires two steps. First, the court must determine as a matter of law the correct scope and meaning of the disputed claim terms. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1365 (Fed.Cir.2002) (citing *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed.Cir.1999)). Second, "the analysis requires a comparison of the properly construed claims to the accused device, to see whether that device contains all the limitations, either literally or by equivalents, in the claimed invention." *Id.* In making its determination of the proper construction of a claim, the court may consider "both intrinsic evidence (*e.g.*, the patent specification and file history) and extrinsic evidence (*e.g.*, expert testimony)," but should first examine "the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). Because it is the public record before the PTO upon which the public is entitled to rely, the intrinsic evidence is the most important source for determining the meaning of claim terms. *See id.* at 1582–83.

### a. Claim language

The starting point for the court's examination of the intrinsic evidence is the language of the disputed claims themselves, as the words of the claim, chosen by the inventor, delimitate the breadth of protection provided by the patent grant. *See Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1464 (Fed.Cir.1998); *Vitronics*, 90 F.3d at 1582; *Bell Communications Research, Inc. v. Vitalink Com-*

*munications Corp.*, 55 F.3d 615, 620 (Fed. Cir.1995). There is a "heavy presumption" that a claim term carries its ordinary and customary meaning, and, if the claim includes a term of art, that term is given its ordinary and accustomed meaning to one of ordinary skill in the relevant art at the time of the invention. *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1315 (Fed.Cir. 1999); *see also Johnson Worldwide Assocs.*, 175 F.3d at 985. The ordinary meaning of a term may be established through dictionary definitions. *See CCS Fitness*, 288 F.3d at 1366. Where the claim language is clear on its face, the remaining intrinsic evidence is considered only to determine whether a deviation from that clear definition is specified. *See Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed.Cir.2001). If the language is not clear, however, the remaining intrinsic evidence is viewed to resolve that ambiguity. *See id.*

### b. Specification

■ After examining the words of the claim, the court's next step is to review the patent's specification. *Vitronics Corp.*, 90 F.3d at 1582. Because the specification must include a written description which is sufficient to enable one of ordinary skill in the art to make and use the invention, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* Although the specification "provide[s] a context to illuminate the meaning of claim terms," *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed.Cir.1997), the court should not interpret those claim terms "by adding limitations appearing only in the specification." *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed.Cir.1994). The general rule is that unless the claims themselves so limit, "the claims of a patent are not limited to the

preferred embodiment" set forth in the specification. *Karlin Tech., Inc. v. Surgical Dynamics, Inc.,* 177 F.3d 968, 973 (Fed.Cir.1999). Moreover, a patentee need not "describe in the specification every conceivable and possible future embodiment of his invention." *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1344 (Fed. Cir.2001) (citations omitted).

■ The "heavy presumption" of the ordinary meaning of a claim term may be overcome and the term narrowed, but an accused infringer cannot "simply point to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *CCS Fitness,* 288 F.3d at 1366. One way the presumption can be overcome is if the patentee decides to be his own lexicographer. However, for the court to accept a suggested meaning that is contrary to the ordinary and accustomed meaning of a word, the novel meaning must be clearly set forth in the specification "so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1268 (Fed.Cir.2001).

c. Prosecution History

■ Additionally, the court may consider a patent's prosecution history in determining the meaning of a claim term. The prosecution history encompasses the entire record of all proceedings before the PTO, including express representations made by the patentee regarding the scope of the patent, as well as prior art cited therein which may give clues as to what the claims do not cover. *See id.; Digital Biometrics,* 149 F.3d at 1344. Amendments to the patent and arguments made to the patent examiner may each be used to exclude an interpretation disclaimed during prosecution, *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576

(Fed.Cir.1995), and each are given equal weight by the court in its interpretation. *Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 979 (Fed.Cir.1999). If a patentee takes a position before the PTO, such that a "competitor would reasonably believe that the applicant had surrendered the relevant subject matter," the patentee may be barred from asserting an inconsistent position on claim construction. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1457 (Fed.Cir.1998). However, "[u]nless altering claim language to escape an examiner['s] rejection, a patent applicant only limits its claims during prosecution by clearly disavowing claim coverage." *York Prods., Inc. v. Central Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1575 (Fed.Cir.1996).

d. Extrinsic Evidence

■ If there is still ambiguity and the court is "unable to determine the meaning of the asserted claims after assessing the intrinsic evidence," a court may consider extrinsic evidence, such as, expert or inventor testimony. *Bell Atl.,* 262 F.3d at 1269; *Vitronics Corp.,* 90 F.3d at 1584. Normally, however, it will be unnecessary for the court to consider extrinsic evidence in interpreting claim language. It is also proper to consult extrinsic evidence for the purpose of understanding the underlying technology. *See Interactive Gift,* 256 F.3d at 1332.

While dictionaries are technically extrinsic to the patent, they have been referred to as a "special form of extrinsic evidence" which courts consulted during claim construction. *Intel Corp. v. Broadcom Corp.,* 172 F.Supp.2d 478, 486 (D.Del.2001). In *Texas Digital Sys., Inc. v. Telegenix, Inc.,* the Federal Circuit recently reaffirmed the use of this resource by holding that "[d]ictionaries ... publicly available at the time the patent issued, are objective resources that serve as reliable sources of informa-

tion on the established meanings that would have been attributed to the terms of the claims by those of skill in the art." 308 F.3d 1193, 1202–03 (Fed.Cir.2002). Because dictionaries define terms unbiased by the motives of parties engaged in litigation, dictionaries (along with encyclopedias and treatises) "may be the most meaningful sources of information to aid judges in better understanding both the technology and the terminology used by those skilled in the art to describe the technology." *Id.* at 1203.

The *Texas Digital* court suggests that when construing the words of a claim, the court should first determine the ordinary and accustomed meanings of disputed claim words through an examination of relevant dictionaries, encyclopedias, or treatises. This determination will reveal the broadest definition of those terms as understood by one of skill in the art. Having made that determination, the *Texas Digital* court suggests that a court must next examine the written description and prosecution history to determine whether the scope of a disputed term has been limited as a result of the patentee clearly setting forth an inconsistent definition of the disputed term or otherwise disavowing or disclaiming the full scope of the term's meaning. Following this procedure, the court construing claims may avoid improperly importing limitations into a claim based on a single embodiment described in the specification, which might occur if the court begins its analysis with an examination of the written description and the prosecution history. *See id.* at 1204–05.

### 2. Construction of the Claims

The court held a claims construction hearing on May 1, 2003, in which the parties presented oral arguments as to the proper construction of the disputed claim language in TSI's patents. The parties

also submitted voluminous amounts of briefs, deposition transcripts, and exhibits, including proposed claim constructions, to the court, all of which were considered by this court in making the claim constructions that follow. On each claim term to be construed, the parties have submitted many arguments and have pointed to many portions of the intrinsic and extrinsic record in their briefs, proposed claim constructions, and oral presentations.

The '585 and '961 patents contain the same specification and illustrations and differ only in the wording of their claims. The '585 patent has multiple claims in dispute,[1] but the parties agree that the court needs to construe only certain terms from independent claims 8 and 17 to resolve all disputes throughout the patent. Claim 8 describes a system for delivering food and states in pertinent part:

> "A food delivery system comprising: a food-holding container including an *induction heatable element;* ... a *temperature controller* operable to control the temperature of said element *during the course of heating* of the element ...."

(Decl. of David C. Jiles in Supp. Defs.' Mot. Summ. J. of Infringement of U.S. Patent Nos. 6,232,585 and 6,444,961, Ex. 3, '585 patent, col. 25, lines 28–46 (emphasis added).)

Claim 17 describes the method for delivering hot food and states in pertinent part:

> A method of delivering a hot-food product comprising the steps of:
>
> providing a food-holding container including an *induction heatable element;*
> providing a *magnetic induction heater* including a magnetic field generator for generating a magnetic field;
> placing said container adjacent said heater to heat the element to a desired temperature;

---

1. Claims 8, 10, 11, 17, and 18.

*controlling the temperature* of said element *during the course of heating* of the element by detecting an *induction heater circuit parameter* whose magnitude is dependent upon the impedance presented by the heating element *when the element is magnetically coupled* with said magnetic field, and altering the magnetic field strength of said magnetic field in response to the magnitude, or rate of change of said magnitude, of said detected parameter, during said course of heating....

(*Id.*, col. 26, lines 4–26 (emphasis added).)

The '961 patent also has multiple claims in dispute,[2] but the parties agree that the court needs to construe only certain terms from independent claim 25 to resolve all disputes throughout the patent. Claim 25 states in pertinent part:

A heating method, comprising:

providing a food-holding container including a heating assembly comprising a *heatable component;*

providing a *magnetic induction heater* including a magnetic field generator for generating a magnetic field, and an induction heater circuit;

placing said container in an *operative position* adjacent said heater so that, when a magnetic field of sufficient strength is generated by said field generator, said component is heated; and maintaining said component in a heated condition by periodically raising the field strength of said field from a low level to a higher level, and maintaining the field strength at said higher level for a period of time, while said container remains in said *operative position*, said *temperature-maintaining step* including the steps of detecting an *induction heater circuit parameter* whose magnitude is at least in part dependent upon the impe-

dance presented by the container when the container is in said *operative position* thereof, and maintaining the magnetic field strength of said magnetic field at said higher level in response to the magnitude, or rate of change of the magnitude, of said detected parameter.

(*Id.*, Ex. 4, '961 patent, col. 28 line 47 through col. 29 line 3 (emphasis added).)

a. "Induction heatable element" (also "Component which is induction heatable")[3]

To understand "induction heatable element," the court must first interpret how one of ordinary skill would understand the terms "induction heating" and "element."

i. "induction heating"

▮▮▮ Defendants do not specifically define induction heating in the specification of TSI's patents. Accordingly, the parties have turned to dictionaries to find the ordinary meaning of the term to one skilled in the art. Defendants claim that induction heating should be defined as "[t]he generation of heat in any conducting material by means of magnetic flux-induced currents." *The Authoritative Dictionary of The Institute of Electrical and Electronics Engineers ("IEEE") Standards Terms*, Seventh Ed. (2000). Defendants contend that the IEEE definition applies because Vesture has not shown that they have "disavowed or disclaimed [the] scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Texas Digital*, 308 F.3d at 1204.

Vesture first argues that the IEEE definition is too broad and cannot be used because it contradicts a definition in another dictionary. When dictionary definitions

---

**2.** Claims 7, 13, 14, 17, 21, 24, 25, 27, and 28.

**3.** This construction applies to Claims 8 and 17 of the '585 Patent and Claims 7 and 13 of the '961 Patent.

contradict each other, Vesture claims that the court must choose the definition which most closely aligns with the intrinsic evidence. *See id.* at 1203. Thus, Vesture contends that the following definition taken from *The Encyclopedia of Electronics* (1985) is much more accurate and consistent with the intrinsic evidence:

Induction heating is a method of heating a metal by causing induced current to flow. The induction heater consists of a large coil, known as a work coil, to which a high power radio-frequency signal is applied. The metal object is placed inside this coil. If the radio-frequency signal is of the correct wavelength, and the power level is high enough, the metal object will become very hot.

Induction heating works because the fluctuating magnetic field, within the coil, causes *circulating currents in the metal;* the ohmic losses in the metal result in the generation of heat. Induction heating makes use of magnetic effects in the same way that electric fields cause dielectrics to become hot.

(Decl. of John M. Berns in Supp. Pl.'s Mot. Summ. J. of Non–Infringement of U.S. Patent Nos. 6,232,585 and 6,444,961, Ex. 1 at 447 (emphasis added).)

Second, Vesture argues that the intrinsic evidence shows that Defendants have narrowed the scope of coverage. Vesture notes that Defendants incorporated by reference the teachings found in PCT patent application WO 98/05184 ("the PCT application") into both the '585 and '961 patents. (*Id.,* Ex. 2, col. 14, line 39; Ex. 3, col. 14, line 38.) It states in pertinent part:

Magnetic induction heating employs alternating magnetic fields such as those produced by an induction coil to induce an electric current in a body including ferromagnetic material placed in the magnetic field. *The induced current in the body creates "eddy currents" which*

*then cause the body to undergo Joule heating* in direct relation to the power, $I^2R$, through the body. The Joule heating effect heats the body so that the body may be used to raise the temperature of objects in contact with the body.

(*Id.,* Ex. 5 at 4, lines 28–33 (emphasis added).) Vesture contends that this passage is virtually identical to its proposed definition of "induction heating". Thus, the IEEE definition should be rejected and Defendants should be estopped from broadening a definition they have voluntarily narrowed.

In response, Defendants assert that their definition is acceptable regardless of Vesture's narrower definition. "If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass *all* such consistent meanings." *Texas Digital,* 308 F.3d at 1203 (emphasis added). Even though their definition may be broader, Defendants claim that it is consistent with the intrinsic record and incorporates Vesture's definition. Defendants also claim that even Vesture's expert, Dr. William T. Joines, agreed that the IEEE definition is applicable to the embodiments disclosed in TSI's patents. (*See* Jiles Decl., Ex. 6, Joines Dep. at 122 line 23 through 123 line 8.) Furthermore, Defendants argue that Vesture's definition is impermissibly narrow. Defendants' expert, Dr. David C. Jiles, testified that two parts of this definition in particular were unduly narrow: (1) "work coil, in which a high-power radio frequency signal needs to be applied," and (2) "metal object is placed inside this coil." (Tr. of *Markman* Hr'g at 91 line 5 through 92 line 6.) Defendants argue that both of these phrases identify elements not necessary for the heating process of induction heating and are not appropriate to the preferred embodiments disclosed in the patents.

Defendants also contend that Vesture has taken the PCT application quote out of context. Defendants claim that the passage, at best, characterizes the type of current that is induced in *one example* of an induction heatable element disclosed in the PCT application and that the passage is not, and does not purport to be, a limiting definition. Defendants argue that at the very least the quote does not rise to the level of "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1327 (Fed.Cir.2002). Defendants claim that if one views the PCT application as a whole, one would see that it also includes an embodiment, Fig. 5, which discloses a coil and a switch, referred to as an "element." (Jiles Decl. in Supp. Defs.' Mot. Summ. J., Ex. 8.) Defendants claim that the current developed in the coil is a linear current, not eddy currents. Thus, the PCT application *includes* linear currents and does not constrain "induction heatable element" to only eddy currents, as Vesture contends.[4]

After reviewing the evidence, the court agrees with Defendants' definition of "induction heating" as "[t]he generation of heat in any conducting material by means of magnetic flux-induced currents." This definition is the most consistent with the intrinsic evidence and also incorporates the narrower definition urged by Vesture. Although the PCT application refers to eddy currents, it does so without exclusively limiting the definition. Moreover, Vesture's definition would impermissibly exclude the PCT application's Fig. 5 embodiment.

## ii. "element"

The parties have put forward two definitions of "element": "a constituent part" (Decl. of Scott R. Brown in Supp. Defs.' Mot. Summ. J. of U.S. Patent Nos. 6,232,585 and 6,444,961, Ex. 8 at 246 (quoting *The New Merriam–Webster Dictionary* )); and "a distinct part of a composite device" (*Id.*, Ex. 1, Prelim. Rebuttal Expert Witness Report of Dr. William Thomas Joines ("Joines Rep.") at 22 (quoting *Merriam Webster's Collegiate Dictionary* )). Because both definitions are consistent with each other, the court finds that "element" is a distinct or constituent part of a composite device.

## iii. "induction heatable element"

With these definitions in mind, the court must now define the specific language of the claim term "induction heatable element." Defendants argue that using the ordinary meaning of the individual terms, an "induction heatable element" is simply an element which is inductively heatable pursuant to the IEEE definition. Vesture claims that the proper definition of "induction heatable element" is "a body that is directly heated through induced eddy currents, the production of eddy currents being known as induction heating." (Pl.'s Mem. in Supp. of Mot. Summ. J. of Non–Infringement of U.S. Patent Nos. 6,232,585 and 6,444,961 at 8.) This definition, however, uses the narrower definition of induction heating previously rejected by

---

**4.** Defendants also claim that the same coil and switch embodiment found in Fig. 5 of the PCT application is described in the '845 provisional application (*Markman* Hearing, Defs.' Ex. 16). The '845 provisional explains in much greater detail that the coil/switch embodiment relies on linear, not eddy, current. (*See id.* at T4504.) Vesture has argued that the '845 provisional application is not incorporated by reference into TSI's patents and, thus, is outside of the prosecution history. Regardless, the court finds that the '845 provisional is instructive and adds support to Defendants' interpretation of the intrinsic evidence.

the court. Accordingly, the court finds that "induction heatable element" is defined as "a distinct or constituent part of a device designed to heat through the process of induction heating."

b. "Heatable component" [5]

■■ Defendants claim that this phrase should be given its ordinary meaning of "a structure [or component] designed to be heated." (Defs.' Proposed Constr. of Disputed Cl. Lang. in U.S. Patent Nos. 6,232,-585 and 6,444,961 at 2; *see also* Mem. in Supp. of Defs.' Mot. Summ. J. of Infringement of U.S Patent Nos. 6,232,585 and 6,444,961 at 17.) Vesture claims that one of ordinary skill in the art would understand the phrase to mean "induction heatable component," especially in light of the intrinsic evidence. Vesture notes that the inventors initially filed their application for the '961 patent with forty-five claims, with two claims including the term "induction heatable element." (*See* Berns Decl. in Supp. Pl.'s Mot. for Summ. J., Ex. 7, claims 1, 45.) Vesture contends that Defendants later added more claims that changed "induction heatable element" to "heatable component." (*Id.*, Ex. 9, claim 62.) During the prosecution of these new claims, Defendants represented to the PTO that the new claims were "*narrower* than certain of the other claims, and are *consonant* with the earlier claims and fully allowable." (*Id.* at 7. (emphasis added).) Claiming that "consonant" means "same," Vesture argues that Defendants cannot attempt to broaden the scope of "heatable component" having already represented to the PTO that the term would be of the same (consonant) scope or narrower than the term "induction heatable element."

Defendants contend that there is no reason from the intrinsic evidence to expand the term "heatable component" to include the word "induction". Defendants do not deny that it made the previously cited statement to the PTO and that the statement concerned the term "heatable component." TSI argues, however, that Vesture attributes an incorrect definition to the term "consonant." Defendants claim that the ordinary meaning of "consonant" is "having consonance, harmony, or agreement," (Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J. of Non–Infringement of U.S. Patent Nos. 6,232,585 and 6,444,961 at 7–8) and that they did nothing more than claim to the PTO that the new claims were in harmony or agreement with the pending claims.

Although Defendants' proposed definition of "consonant" is accurate, the court finds that their interpretation is not. If "heatable component" was "consonant" with the earlier claims, then that term was in "harmony or agreement," with the earlier claims, not broader or more expansive. Defendants' proposed definition of "heatable component" as "a structure [or component] that heats" is much broader than the terms used in the earlier claims, *i.e.*, "induction heatable element." Thus, the court defines the term "heatable component" to mean the same as "induction heatable element."

c. "Magnetic induction heater" (also "induction heating unit") [6]

■■ Defendants claim that "magnetic induction heater" should be defined as "a heater that generates a magnetic field designed to heat the claimed food-holding container." (Defs.' Proposed Constr. of Disputed Cl. Lang. at 1.) Vesture contends that the proper definition is "an induction cooktop, with its associated circuits, the cooktop being used to generate a magnetic

---

5. This construction applies to Claims 17, 21, and 25 of the '961 Patent.

6. This construction applies to Claims 8 and 17 of the '585 Patent and Claims 7, 13, 17, 21, and 25 of the '961 Patent.

field for use in induction heating." (Pl.'s Proposed Cl. Constr. at 3.) The parties have not pointed the court to any evidence in the intrinsic record which narrows the ordinary meaning of "heater" to a "cook-top," although it is included in the preferred embodiments of TSI's patents. Thus, the court defines "magnetic induction heater" as "a heater that generates a magnetic field designed to heat the claimed food-holding container."

d. "[While/When] the element is magnetically coupled" (also "Coupling with said magnetic field;" "When the assembly is magnetically coupled") [7]

 The key term in this phrase is "magnetically coupled." TSI claims that "magnetic coupling" is when a "fluctuating current produces a changing magnetic field, which in turn produces changing currents in nearby objects. This is especially true when coils of wire are placed along a common axis. This form of magnetic coupling is called electromagnetic induction." (Mem. in Supp. Def.'s Mot. Summ. J. at 13, quoting *The Encyclopedia of Electronics.*) Defendants assert that this definition encompasses their interpretation of induction heating and the embodiment (Fig. 5) in the PCT application having a flat spiral coil and switch. Thus, Defendants contend that "the element is magnetically coupled" when the magnetic induction heater creates a magnetic field that induces voltage or current in the induction heatable element. (Def.'s Proposed Constr. of Disputed Cl. Lang. at 2.)

Vesture claims that "magnetic coupling" refers to "the mutual induction between elements in a fluctuating electromagnetic field." (Pl.'s Mem. in Opp'n to Def.'s Mot. Summ. J. of Infringement of U.S. Patent

Nos. 6,232,585 and 6,444,961 at 10–11.) Vesture further contends that the phrase "when the element is magnetically coupled" should be defined as follows: "When the induction heatable element is placed within the magnetic field generated by the induction heater, the induction heatable element heats by induction heating because of the direct magnetic connection between the magnetic field generator and the element." (Pl.'s Proposed Cl. Constr. at 3.)

Defendants argue that Vesture's definition of "magnetic coupling" impermissibly narrows the definition to eddy current induction which would exclude the specific embodiment (Fig. 5) of the disclosure. As Defendants note, the Federal Circuit has held that "a claim interpretation that reads out a preferred embodiment 'is rarely, if ever, correct.'" *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1349 (Fed.Cir.2003) (quoting *Vitronics,* 90 F.3d at 1583).

Because the court finds no reason to disagree with the dictionary definition of "magnetic coupling," the court agrees with Defendants' definition of the phrase "[while/when] the element is magnetically coupled."

e. "A temperature controller" [8]

 Defendants claim that "a temperature controller" is defined as "a structure that controls the temperature by maintaining the temperature of the element in a heated condition." (Def.'s Proposed Constr. of Disputed Cl. Lang. at 2.) Vesture claims that the correct definition of "temperature controller" is

a temperature controller in the induction heater that actively regulates the temperature of the induction heatable ele-

---

7. This construction applies to Claims 8 and 17 of the '585 Patent and Claims 7 and 13 of the '961 Patent.

8. This construction applies to Claim 8 of the '585 Patent and Claim 7 of the '961 Patent.

ment to a set temperature during the course of heating by monitoring a parameter of an induction heater circuit in the induction heater whose magnitude depends upon changes in the impedance presented by the induction heatable element related to the induction heatable element's Curie temperature. If the temperature controller is not present, the temperature would not be controlled. The temperature controller does not include indirect control.

(Pl.'s Prop. Cl. Constr. at 2.)

Defendants have multiple problems with Vesture's proposed definition. First, Defendants claim that Vesture has added many superfluous words which repeat language found elsewhere in some of the claims but not in others. In particular, Defendants point to the fact that the '961 patent claims 17, 21, and 25 all lack the term "during the course of heating." Second, Defendants claim that Vesture attempts to add unsupportable words into the definition. For example, Defendants argue that Vesture's addition of "Curie" is an attempt to limit the definition of "temperature controller" to the type of ferromagnetic material found in the preferred embodiment heatable element. Defendants contend that nothing in the intrinsic record supports limiting the "temperature controller" to the type of material found in the food delivery bag. They argue that the patent claims require the temperature controller to detect and react to the change in a circuit parameter in the *induction heater*, without reference to the specific composition of the induction heatable element. Third, Defendants argue that the sentence "if the temperature controller is not present, the temperature would not be controlled," is gratuitous and is included simply to support Vesture's non-infringement argument.

In response, Vesture first argues that "Curie" must be included in this definition.

Even though it agrees that the term comes from the preferred embodiment, Vesture claims that Defendants have not pointed to any other embodiment disclosed in the specifications. Vesture contends that changes in the element's metallic properties at the Curie temperature allow the temperature controller in the induction heater to operate and that this operation is what Defendants were describing when they defined the invention as comprising "the steps of controlling the temperature of the element about a regulation temperature above the element's Curie temperature." (Berns Decl. in Supp. Pl.'s Mot. Summ. J., Ex. 2, col. 3, lines 33–36.) Claiming that this case "directly parallels" *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed.Cir.1999) (granting summary judgment of non-infringement after limiting the claims in the patent to the only embodiment described in the patent), Vesture argues that the preferred embodiment disclosed in the specification is the only embodiment described in the patents and thus must operate to limit the claims. *See also Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295 (Fed.Cir.1999).

Second, Vesture argues that Defendants' definition is much too broad and would impermissibly include elements disclaimed by Defendants during prosecution of the patents. Vesture avers that Cooktek's president explained to the PTO that prior art systems used thermostats or similar mechanisms for maintaining the bag temperature. (Berns Decl. in Supp. Pl.'s Mot. Summ. J., Ex. 11 at 2, ¶ 4.) He further stated that the prior art "corded systems generally make use of thermostats or like technology, whereas the [invention] uses a different temperature maintenance technique." (*Id.* at 6–7, ¶ 9.) Vesture also points to TSI's patents' specifications for support that the term "temperature controller" cannot be so broad so as to include thermostats or thermistors: "This inven-

tion pertains . . . to inductively heatable vessels that are capable of temperature self-regulation . . . *without the assistance of a prior art thermostat or other prior art temperature sensing device.*" (*Id.*, Ex. 12 at 1 (emphasis added).) Because the use of "thermistor circuits" and "thermostats" had drawbacks, the invention was created with "a new method of temperature regulation that . . . would . . . maintain precise temperature . . . *without the use of a prior art thermostat or other prior art heat sensing device.*" (*Id.* at 3 (emphasis added).) Lastly, Vesture argues that the prosecution history supports its interpretation of the "temperature controller". During prosecution of the '585 patent, the PTO Examiner initially rejected the claims of the patent over the "Poumey" and "Cunningham" patents. In so doing, the Examiner stated that it "is well known and routine in the art of induction cookers which include a food container with a ferromagnetic heating element *to use a temperature [sic 'thermostat'] to detect the temperature* of the food being cooked to feedback the heating power." (*Id.*, Ex. 13 at 5–6, ¶ 12 (emphasis added).) In response to this rejection, Defendants argued that "none of the art, most especially the patents referred to in paragraph 12 of the action [Poumey and Cunningham], disclose or suggest a temperature control method carried out during the course of heating of the element and including *detecting an induction heater circuit parameter related to the impedance as claimed* . . . ." (*Id.*, Ex. 15 at 8 (emphasis added).)

While acknowledging the previous statements, Defendants argue that these statements do not disclaim any or all uses of a thermostat or thermistor. Defendants claim that their statements to the PTO and in the patent were simply meant to distinguish the prior art, which relied solely on a thermostat/thermistor to *directly* feed temperature information to the heater, from their claims which relied on "*indirect*

temperature sensing by detecting a change in an induction circuit heater parameter that results from a change in the impedance in the pizza bag." (Def.'s Reply to Resp. to Mot. Summ. J. of Infringement of U.S. Patent Nos. 6,232,585 and 6,444,961 at 6 (emphasis added).) Defendants claim that none of these statements would disclaim coverage for a product that uses *both* a thermostat/thermistor that feeds temperature information to a heater *and* the detection of an induction heater circuit parameter to control temperature. In other words, Defendants argue that these statements do not distinguish using a thermostat/thermistor generally, but rather as the *only* feedback mechanism. (*Id.* at 7.)

After a thorough review of the intrinsic evidence and the parties' arguments, the court defines "temperature controller" as "the induction heater that controls and regulates temperature of the induction heatable element in a heated condition." The court finds that inclusion of the remaining portion of Vesture's proposed definition would be redundant, as it is often repeated elsewhere throughout the claims. Furthermore, Vesture's inclusion of the sentence "[t]he temperature controller does not include indirect control" is found to have no support in its argument nor in the intrinsic record.

As for the term "Curie," the court finds that the intrinsic evidence does not support inclusion of such a limitation. Although this term is used quite frequently in the patents' specifications of the preferred embodiments, the claims themselves are not so limited. Moreover, Vesture's reliance on *Wang Labs.* and *Toro* is misplaced. Neither of these cases mandates the narrow limitation described by Vesture. In fact, the Federal Circuit has held just the opposite:

Although precedent offers assorted quotations in support of differing con-

clusions concerning the scope of the specification, these cases must be viewed in the factual context in which they arose. Whether an invention is fairly claimed more broadly than the "preferred embodiment" in the specification is a question specific to the content of the specification, the context in which the embodiment is described, the prosecution history, and if appropriate the prior art, for claims should be construed, when feasible, to sustain their validity. *Wang Labs.*, 197 F.3d at 1383. "In sum, the number of embodiments disclosed in the specification is not determinative of the meaning of disputed claim terms." *Teleflex*, 299 F.3d at 1327. As the Federal Circuit further explained in *CCS Fitness*, an accused infringer cannot overcome the "heavy presumption" that a claim term takes on its ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." 288 F.3d at 1366. A review of the intrinsic evidence, including the claims themselves, reveals that the term "temperature controller" is not necessarily limited to the properties of the material nor to its "Curie" temperature.

f. "Controlling the temperature"[9]; "Control assembly"[10]; "Temperature control assembly"[11]; "Temperature maintaining step"[12]

All parties agree that the definition of "temperature controller" should dictate the definitions of these four related terms. Defendants claim that: "controlling the temperature" should be defined as "maintaining the temperature of the element in a heated condition"; "control assembly" should be defined as "a group of parts that controls something"; "temperature control assembly" should be defined as "a group of parts that controls temperature by maintaining the temperature of the element in a heated condition"; and "temperature maintaining step" should be defined as "the step of maintaining the temperature of the heatable component in a heated condition." (Def.'s Proposed Constr. of Disputed Cl. Lang. at 2–3.) Similarly, Vesture contends that these four phrases can all be defined using its proposed definition of "temperature controller." (Pl.'s Proposed Cl. Constr. at 3–5.)

With the definition of "temperature controller" in mind, the court finds the following: (1) "Controlling the temperature" is defined as "controlling and regulating the temperature of the induction heatable element in a heated condition"; (2) "Control assembly" is defined as "a group of parts that controls something"; (3) "Temperature control assembly" is defined as "a group of parts that controls temperature by controlling or regulating the temperature of the induction heatable element in a heated condition"; (4) "Temperature maintaining step" is defined as "the step of controlling and regulating the temperature of the induction heatable element in a heated condition."

g. "Induction heater circuit parameter"[13]

██ Defendants claim that "induction heater circuit parameter" should be defined as "a measurable characteristic of

9. This construction applies to Claim 17 of the '585 Patent.

10. This construction applies to Claim 13 of the '961 Patent.

11. This construction applies to Claims 17 and 21 of the '961 Patent.

12. This construction applies to Claim 25 of the '961 Patent.

13. This construction applies to Claims 8 and 17 of the '585 Patent and Claims 7, 13, 17, 21, and 25 of the '961 Patent.

the induction heater circuit." (Def.'s Proposed Constr. of Disputed Cl. Lang. at 3.) Vesture contends that the proper definition of "induction heater circuit parameter" is "any of the feedback parameters related to the impedance of the load presented to the magnetic induction cooktop by the heating element that is used to control the temperature of the induction heatable element." (Pl.'s Proposed Cl. Constr. at 2.) Because the parties have not presented much discussion about this term, the court will attempt to undertake its own analysis.

Although the ordinary and common meaning of "parameter" may be "a measurable characteristic," this does not explain the remaining words, "induction heater circuit." After reviewing the claims using this term, it is apparent to the court that a more definite explanation of this term is required than that offered by Defendants in their pleadings and during the claims construction hearing. In each claim using this term, "induction heater circuit parameter" is used in the context of describing such things as altering the "impedance" of the heating element and its "magnetic field strength" in order to control the temperature of the element. Vesture's definition most accurately describes these actions. Accordingly, the court holds that the definition of "induction heater circuit parameter" is "a measurable characteristic related to the impedance of the load presented to the magnetic induction heater by the heating element that is used to control the temperature of the induction heatable element."

h. "During the course of heating" [14]

■■■ Defendants claim that "during the course of heating" means "the time period after the induction heatable element of the food-holding container has begun heating

by means of magnetic flux-induced current until the food-holding container is removed from the apparatus." (Def.'s Proposed Constr. of Disputed Cl. Lang. at 2.) The court has not found any proposed definition of this term by Vesture in its pleadings. After a review of the evidence, the court finds no reason to disagree with Defendants' proposed definition.

i. "Operative position" [15]

■■■ Defendants contend that "operative position" means "a position adjacent the heater that allows the heater to operate on the food-holding container." (*Id.* at 3.) Vesture maintains that "operative position" should be defined as when "an induction heatable element is placed on an induction cooktop in such a way that induction heating occurs and the temperature of the induction heatable element is controlled by sensing a cooktop heater circuit parameter whose magnitude is dependent upon the impedance presented by the induction heatable element." (Pl.'s Mem. in Opp'n to Def.'s Mot. Summ. J. at 18–19.) Defendants argue that Vesture, once again, has imported limitations from the specification into the claims and has impermissibly narrowed the ordinary meaning of this term by adding the term "induction heating" and language having to do with the definition of "temperature controller" into this definition (*i.e.*, "and the temperature of the induction heatable element is controlled").

Although the court agrees with Defendants that Vesture's proposed definition includes extraneous wording imported from their definition of "temperature controller," the remainder of Vesture's definition is accurate and similar to Defendants' proposed definition. Furthermore, while "induction heating" is not a part of the

---

**14.** This construction applies to Claims 8 and 17 of the '585 Patent.

**15.** This construction applies to Claims 17, 21, and 25 of the '961 Patent.

ordinary definition of "operative position," it is part of Defendants' use of the term in their claims. Accordingly, the court finds that "operative position" is best defined as "a position adjacent the induction heater that allows the induction heater to operate on the food-holding container in such a way that induction heating occurs."

### D. Patent Infringement

#### 1. Legal Principles

After construing the claims, the second step of the two-prong process for the court is to compare the elements of the patent claims to the allegedly infringing product. The general rule is that a patent claim covers an accused device if that device embodies every element of the claim, either literally or by an equivalent element. *See, e.g., Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,* 15 F.3d 1573, 1576 (Fed.Cir.1993). In the present case, Plaintiff is proceeding on a theory of literal infringement. To succeed, Plaintiff "must show that the accused device contains every limitation in the asserted claims. If even one limitation is missing or not met as claimed, there is no literal infringement." *Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1211 (Fed.Cir.1998) (citations omitted). Though this infringement question is typically for the fact finder, it becomes amenable to summary judgment where the parties do not dispute any relevant facts regarding the accused product, *see, e.g., General Mills, Inc. v. Hunt–Wesson, Inc.,* 103 F.3d 978, 983 (Fed.Cir. 1997), or when the court finds "no genuine issue as to any material fact" for trial. Fed.R.Civ.P. 56(c). In this case, the parties do not dispute any relevant facts regarding Vesture's product.

#### 2. Comparison of Plaintiff's Product to TSI's Patents

Plaintiff and Defendants move for summary judgment on the issue of literal infringement. Moreover, Defendants move for summary judgment on the issues of contributory infringement and inducement of infringement.

#### a. Literal Infringement

As explained previously, the '585 and '961 patents contain multiple disputed claims, but the parties agree that the court needs to determine infringement only for independent claim 17 of the '585 patent and claim 25 of the '961 patent to resolve all disputes.[16]

#### i. Claim 17 of the '585 Patent

Claim 17 describes a method of delivering hot food, comprising the steps of:

> providing a food-holding container including an induction heatable element;
>
> providing a magnetic induction heater including a magnetic field generator for generating a magnetic field;
>
> placing said container adjacent said heater to heat the element to a desired temperature;
>
> controlling the temperature of said element during the course of heating of the element by detecting an induction heater circuit parameter whose magnitude is dependent upon the impedance presented by the heating element when the element is magnetically coupled with said magnetic field, and altering the magnetic field strength of said magnetic field in response to the magnitude, or rate of change of said magnitude, of said detected parameter, during said course of heating;

---

**16.** Independent claim 8 of the '585 patent is also in dispute. Because Vesture has made the same arguments in opposition to claim 8 as it has to claim 17, determining infringement as to claim 17 should resolve all disputes.

inserting hot food product within the container, and withdrawing said container from said magnetic field; and

delivering said hot food product in said container a remote delivery location, and removing the food product therefrom.

'585 patent, col. 26, lines 4–26. This court must determine whether each of the six elements of claim 17 is present in the accused product.

(1) "providing a food-holding container including an induction heatable element"

Vesture does not dispute that its allegedly infringing system, the VEST 400, provides for a food-holding container. It does dispute that it contains an "induction heatable element." Vesture claims that the heatable element in its bag uses "resistive heating" rather than induction heating. (See, e.g., Pl.'s Mem. in Supp. Mot. Summ. J. at 13–16.) The court has previously defined "induction heating" as "the generation of heat in any conducting material by means of magnetic flux-induced currents." The court has also defined "induction heatable element" as "a distinct or constituent part of a device designed to heat through the process of induction heating."

Defendants argue that current is induced into Vesture's heatable circuit as a result of the magnetic field created by its induction heater. Then, induced current passes throughout the heatable circuit (i.e., through the induction coil, switch, and conductive resistor) to generate heat. Defendants claim that all of the heat-generating current in the Vest 400 is actually magnetic flux-induced current. (See Mem. in Supp. Defs.' Mot. Summ. J. at 9; see also Jiles Decl. in Supp. Defs.' Mot. Summ. J., Ex. 6, Joines Dep. at 111 line 19 through 112 line 3.) Thus, Defendants argue that Vesture's product includes an "induction heatable element."

Vesture disagrees and claims that its product contains a "resistive heating element" not an "induction heatable element."

Vesture first argues that the physical properties of the two products are different. Defendants' "induction heatable element" is a disk of metal, whereas Vesture's product has a "zig-zag resistive heater, a copper coil that is the power source, and other associated control circuitry." (Pl.'s Mem. in Supp. Mot. Summ. J. at 14.) Vesture contends that this resistive heater is "powered" by induction but is not "heated" by induction heating, which it defines as involving "heating that occurs by directly inducing eddy currents in a ferromagnetic material." (Id.)

Vesture claims that the prior art makes a distinction between "induction powered heating" and induction heating. It contends that induction powered heating uses a resistive heating element that generates heat when electricity flows through it. (Pl.'s Mem. in Opp'n to Defs.' Mot. Summ. J. at 7–9.) For support in the prior art, Vesture first points to the "Harnden" patent. Harnden states that a *resistive heating apparatus or appliances such as toaster 25 can also be supplied with power by the induction heating coil.*" (Berns Decl. in Supp. Pl.'s Mot. Summ. J., Ex. 28, col. 4, lines 30–33 (emphasis added).) Vesture also cites the Poumey patent as stating:

The present invention relates to a removable electric hotplate, intended to be used on an inductive heating power source. It relates in particular to the *power supply* of such plates from any inductive heating-power source.... The use of *induced electric current* thus enables the presence of leads and other electric wires for supplying power to the appliances, in particular the hotplate, to be done away with ....

(Id. at Ex. 14, col. 1, lines 1–8, 37–41 (emphasis added).) Vesture also asserts that its "heating element" can be only one thing, not a group or number of items. In

the case of the Vest 400, Vesture claims that the "resistive heating element" is the silver square metal plate with zig-zag pattern on it, not the heatable circuit of its bag.

Lastly, Vesture argues that Defendants have admitted that the Vest 400 uses a resistive heater powered by induction instead of induction heating. Vesture claims that one of Defendants' inventors, Brian Clothier, tested Vesture's product prior to this lawsuit and created a presentation and video about the testing, describing Vesture's product using terms such as "copper coils," "resistive element," "resistive heating element," and "resistive grid." (*Id.*, Ex. 17 at T6748, Ex. 32 at 2–3.) He also stated "[t]his large coil *powers* the heating element." (*Id.* (emphasis added).) Furthermore, Vesture claims that a study of the Vest 400 by Dr. Marcus Johnson, commissioned by Defendants' expert, Dr. Jiles, also uses the same distinction. Dr. Jiles considered Dr. Johnson an expert in "electromagnetic induction and eddy current techniques." (*Id.*, Ex. 21 at 16, lines 14–15.) In this report, Dr. Johnson's summary explains how Vesture's product works:

> Q1: What heating mechanism is employed by the SmartCharger/SmartBag?
> A1: A *resistance heater* driven by current induced in the larger of SmartBag's two coils is used to heat the SmartBag.

(*Id.*, Ex. 22 at J0009 (emphasis added).)

In response, Defendants first point out that the court has previously rejected Vesture's proposed definition narrowing "induction heating" only to eddy currents. Second, Defendants claim that all induction heating *includes* resistive heating. They claim that all induction heating includes the principle of passing induced heat through a resistor to heat an object. (*See* Jiles Decl. in Supp. Defs.' Mot. Summ. J. at ¶ 11.) Because induced heat passes through its resistor, Vesture's product applies induction heating. Third, Defendants contend that the prior art does not make a distinction between induction powered heating and induction heating. Although the Harnden and Poumey patents each discuss supplying power from an induction coil, neither distinguishes between supplying power and inducing eddy currents. For example, Poumey effectively refers to the terms interchangeably stating in its abstract that, "A portable electric hotplate *is heated by an inductive heating power source* having a glass ceramic plate and a primary induction coil." (Berns Decl. in Supp. Pl.'s Mot. Summ. J., Ex. 14, Poumey abstract (emphasis added).)

Defendants also dispute Vesture's argument that the heatable circuit of its bag is not an "element." Defendants claim that Vesture's heatable circuit including the induction coil, triac switch and resistor is considered an "element." Vesture's bag has an insert, composed of the induction heatable circuit, the control circuit, insulation, and plastic pieces to hold the assembly together. Thus, the induction heatable circuit is an element of that assembly, or a "distinct or constituent part of a composite device." Defendants contend that the heatable circuit operates as a unified circuit to perform a distinct function, converting the energy of the magnetic field into heat.

Defendants also claim that Vesture's emphasis on statements made by Clothier and Dr. Johnson for support is irrelevant and misleading. Defendants do not dispute that these statements use terms describing a resistor or "resistive grid" that heats in Vesture's product. Defendants argue, however, that the "key" is "that the current that passes through and thereby heats the resistor was induced into the circuit by a magnetic field generated by an induction heater." (Defs.' Mem. in Opp'n to Pl.'s Mot. Summ. J. at 10.)

Lastly, Defendants presented evidence that Vesture has used "induction heating" to describe its own product and that the alleged distinction between "resistive heating" and "induction heating" was simply created by Vesture for this litigation. In 2001, prior to any litigation, Vesture contracted with Donato's Pizza to supply its food-delivery product. In Paragraph 1(c) on the first page of the contract, it says, "'Induction System (Without On–Board Lights)' means the thermal pizza delivery induction heating system...." (Trans. of *Markman* Hearing at 216; Defs.' Ex. Book Tab 34.) Also prior to any litigation, in a handwritten note, Vesture's opinion counsel stated, "Telecon with Mark Van Hoy [one of the inventors and chief engineer/designer of the Vesture product]—Vesture re induction system. They have instructed people to no longer refer to it as an *induction* system—but simply call it a 'charger.'" (*Id.* at 216–17; Defs.' Ex. Book Tab 35.) Finally, during the prosecution of the patent for its product, Vesture used the title "Delivery bag with induction heating" to describe its patent. (*Id.;* Defs.' Ex. Book Tab 33.)

After a thorough review of the record, the court finds that the Vesture product does contain "an induction heatable element." While the court notes that Vesture's product differs in physical appearance from the embodiments in TSI's patents, this difference does not account for any alleged distinction between a "resistive heating element" and an "induction heating element." Defendants have conceded that a "resistor" or "resistive element" is present in Vesture's product; however, this element is heated with inductive heating, as previously defined. The court does not find any explicit distinction in the prior art or the record between "induction heating" and "induction powered heating," especially considering the evidence of Vesture's prior inconsistent statements concerning its use of the term "induction heating" in conjunction with its own product. Having previously defined "element," the court also finds that a heatable circuit can be considered an element.

(2) "providing a magnetic induction heater including a magnetic field generator for generating a magnetic field"

Defendants argue that this statement describes the Vesture base unit with the induction heating coil that generates a magnetic field. (Jiles Decl. in Supp. Defs.' Mot. Summ. J., Ex. 7 at 2.) Vesture concedes that its product contains "a magnetic field generator for generating a magnetic field," but argues that it does not have a "magnetic induction heater" because no "induction heating" occurs in its device. (Brown Decl. in Supp. Defs.' Mot. Summ. J., Ex. 1, Joines Rep. at 24, 26.) As the court has already clarified that Vesture's product operates by induction heating, the court finds that Vesture's product provides "a magnetic induction heater including a magnetic field generator for generating a magnetic field."

(3) "placing said container adjacent said heater to heat the element to a desired temperature"

It is undisputed that Vesture's product must be placed on its charger to heat the element in the bag to the desired temperature.

(4) "controlling the temperature of said element during the course of heating of the element by detecting an induction heater circuit parameter whose magnitude is dependent upon the impedance presented by the heating element when the element is magnetically coupled with said magnetic field, and altering the magnetic field strength of said magnetic field in response to the magnitude, or rate of change of said magnitude, of said detected parameter, during said course of heating"

Although Vesture disputes that its product performs these steps of "controlling

the temperature," it does not dispute that: its induction heater has a controller within it; there is a current detector that detects current in the heater circuit; as a result of that current detection, the controller turns the magnetic field on and off; if its bag is placed on the base unit and heats to the desired temperature, the magnetic field turns off; and, if the magnetic field were not turned on again by the controller in the induction heater unit, the bag would cool to room temperature and never heat again. (*See id.*, Ex. 2, Joines Dep. at 31.) Thus, the only disputed question is whether this operation constitutes "temperature control."

The court has previously defined "temperature controller" as "the induction heater that controls and regulates temperature of the induction heatable element in a heated condition." Vesture contends, however, that all of its temperature control is contained within its food-delivery bag and none occurs by virtue of the actions taken by the controller within its induction heater. (*See id.*, Ex. 1, Joines Rep. at 25–27.) It claims that its product controls the temperature with a "thermistor circuit" in the food-delivery bag that "directly senses the temperature, not with a 'temperature controller' in the induction cooktop that 'detects an induction heater circuit parameter.'" (Pl.'s Mem. in Opp'n Defs.' Mot. Summ. J. at 15.) Moreover, Vesture asserts that its use of a thermistor is much like that of prior art patents. Also, the PTO Examiner originally rejected TSI's patents over Poumey and similar patents in the prior art due to their use of a thermostat or thermistor to detect the temperature. Lastly, Vesture claims that its use of the "load/no load circuitry" in the cooktop is simply for safety reasons and merely reacts as prior art circuitry did. Even if the circuitry were disabled and the induction heater magnetic field was always on, Vesture argues that its bag would continue to operate normally.

Defendants claim that all of Vesture's temperature control is not located in the food-delivery bag and that both the bag and the heater work together to control the temperature. Defendants explain that Vesture's pizza bag has an induction heatable element made from an induction coil connected via a switch to a resistor. The switch is closed and the circuit heats when the bag is placed in the magnetic field created by the induction heater. Defendants assert that a thermistor measures the heat generated by the circuit, and causes (1) the switch to open when a set point temperature is reached and (2) the impedance presented by the bag to the induction heater to change, which in turn is detected by the induction heater and the induction heater turns the magnetic field off. When the circuit in the bag cools below a set temperature, the thermistor causes the switch to close, again changing the impedance presented by the bag to the induction heater, which is also detected by the temperature controller and turns the magnetic field back on and heats the circuit.

Defendants assert that this is the actual operation of Vesture's temperature control system and that there is no direct connection between the thermistor in Vesture's bag and the induction heater. Unlike prior art systems that utilized thermostats or thermistors to control temperature by directly connecting the object being heated with the cooktop or range, Vesture's product utilizes the thermistor to control the impedance of the heatable circuit within its food-delivery bag. The prior art patents did not have a temperature controller or perform a temperature control step that relied on detecting a circuit parameter of the induction heater. Because Vesture's product includes a thermistor that is not directly connected to the induction heater, it relies on indirect feedback of impedance

to the induction heater in order to maintain temperature control.

Defendants also note that Vesture's system does not operate as it hypothesized with the load/no load circuitry disabled. Vesture's product cycles between standby mode (magnetic field off) and heating mode (magnetic field on). Once the bag reaches the higher set temperature, the induction heater switches to standby mode. If the induction heater is not then switched back on to heating mode, the bag would never be heated again. Furthermore, Vesture's engineer, Mark Van Hoy, described the operation of the Vesture product in very similar terms:

> Normal Operation of Temperature Control Cycle:
>
> . . . .
>
> If the Element is allowed to remain on the charger to a point that the solid state controller falls below the setpoint temperature and the triac is reactivated, the charger shall detect the load being reconnected and enter the charging state.

(Brown Decl. in Supp. Defs.' Mot. Summ. J., Ex. 10 at V1298.) In fact, Defendants concede that if Vesture's system did operate this way, the system would not infringe its patents. (Mem. in Supp. Def.'s Mot. Summ. J. at 15.)

Lastly, during the claims construction hearing, Defendants presented evidence regarding the cooperation between Vesture's heater and the food-delivery bag to control temperature in its product. Defendants presented a handwritten note by one of the inventors of the Vest 400 in which he writes, "Abandon concept of Curie point material susceptor and go to feedback loop to facilitate turning cook unit off and on to control temperature." (Trans. of *Markman* Hearing at 219; Defs.' Ex. Book Tab 36.) Defendants claim that this pre-litigation statement supports the interpretation

that Vesture's induction heater (or charger) controls temperature.

After consideration of the extensive evidence, the court finds that Vesture's product controls temperature through the cooperation of both its cooktop or heater unit and its food-delivery bag. The court also finds that the thermistor's use in Vesture's product is different from its use in prior art patents. The court has already considered Vesture's argument on thermostats/thermistors and has rejected its proposed definition which would have excluded any thermostats/thermistors from TSI's patents. Thus, although Vesture's product includes a different embodiment of a food-delivery system utilizing a thermistor to control temperature, it still performs the operation of "temperature control" as previously defined by this court.

Finally, Vesture's expert argues that its resistor is not "magnetically coupled" because eddy currents are not induced in the resistor. (Berns Decl. in Supp. Pl.'s Mot. Summ. J., Ex. 1, Joines Rep. at 24, 26.) The court has already determined that the definition of "magnetically coupled" need not be so limited. The key dispute here, however, is about what makes up the "element" which is magnetically coupled. As stated previously, an "element" is not necessarily one item or component, but is defined as "a distinct or constituent part of a composite device." Although the resistor may also be called a "resistive heating element," the entire heatable circuit of Vesture's product may also be called an "element" as it is a distinct part of the larger composite device in the food-delivery bag. Thus, the resistor as part of Vesture's induction heatable circuit (including the coil and switch) is magnetically coupled when placed adjacent to the heater.

Accordingly, the court finds that Vesture's product relies on

controlling the temperature of said element during the course of heating of the element by detecting an induction heater circuit parameter whose magnitude is dependent upon the impedance presented by the heating element when the element is magnetically coupled with said magnetic field, and altering the magnetic field strength of said magnetic field in response to the magnitude, or rate of change of said magnitude, of said detected parameter, during said course of heating.

(5) "inserting hot food product within the container, and withdrawing said container from said magnetic field"

(6) "delivering said hot food product in said container a remote delivery location, and removing the food product therefrom."

It is undisputed that these two remaining steps of Claim 17 are carried out by Vesture's customers. Vesture's manual, shipped with its product, instructs customers accordingly: "The charged bag is ready for use. When the pizza is boxed and ready, open the bag's flap and load the pizza box. Now it's READY FOR DELIVERY." (Brown Decl. in Supp. Defs.' Mot. Summ. J., Ex. 11, Dep. of Mark Van Hoy, Vol. I at 115–17; Ex. 12.)

ii. Claim 25 of the '961 Patent

The '961 patent has the same disclosure as the '585 patent. Claim 25 claims a heating method, comprising:

providing a food-holding container including a heating assembly comprising a heatable component;

providing a magnetic induction heater including a magnetic field generator for generating a magnetic field, and an induction heater circuit;

placing said container in an operative position adjacent said heater so that, when a magnetic field of sufficient strength is generated by said field generator, said component is heated; and maintaining said component in a heated condition by periodically raising the field strength of said field from a low level to a higher level, and maintaining the field strength at said higher level for a period of time, while said container remains in said operative position, said temperature-maintaining step including the steps of detecting an induction heater circuit parameter whose magnitude is at least in part dependent upon the impedance presented by the container when the container is in said operative position thereof, and maintaining the magnetic field strength of said magnetic field at said higher level in response to the magnitude, or rate of change of the magnitude, of said detected parameter.

'961 patent, col. 28 line 47 through col. 29 line 3.

This court must determine whether each of the five elements of Claim 25 is present in the accused product.

(1) "providing a food-holding container including a heating assembly comprising a heatable component"

The court has already found that Vesture's product provides a "food-holding container." The court has also previously held that Vesture's product includes an "induction heatable element." Because the term "heatable component" has been defined to mean the same as "induction heatable element," the court finds that Vesture's product includes "a heating assembly comprising a heatable component."

(2) "providing a magnetic induction heater including a magnetic field generator for generating a magnetic field, and an induction heater circuit"

For the reasons stated previously the court finds that Vesture's product provides "a magnetic induction heater including a

magnetic field generator for generating a magnetic field, and an induction heater circuit."

(3) "placing said container in an operative position adjacent said heater so that, when a magnetic field of sufficient strength is generated by said field generator, said component is heated"

It is undisputed that Vesture's food-delivery bag is meant to be placed on top of its induction heater and that this also means that it is "adjacent" to the heater, using the ordinary meaning of that word. The court has defined "operative position" as "a position adjacent the induction heater that allows the induction heater to operate on the food-holding container in such a way that induction heating occurs." Because Vesture's product has an induction heater that heats the food-delivery bag using induction heating, the court finds that Vesture's product has a food-delivery bag positioned in an "operative position." Thus, Vesture's customers place "said container in an operative position adjacent said heater so that, when a magnetic field of sufficient strength is generated by said field generator, said component is heated."

(4) "maintaining said component in a heated condition by periodically raising the field strength of said field from a low level to a higher level, and maintaining the field strength at said higher level for a period of time, while said container remains in said operative position"

It is undisputed that Vesture's induction heater periodically raises its magnetic field strength from a lower level to a higher level. Defendants claim that the field strength is raised to maintain the heatable circuit within the bag in a heated condition while the bag is on the induction heater. Vesture's main argument pertaining to this step is that the definition of "maintaining said component in a heated condition" cannot be broader than the definition of "temperature control," which it claims

does not encompass the use of thermostats/thermistors. While agreeing that this term should not be broader than "temperature control," the court has already rejected Vesture's narrow definition of "temperature control." Thus, Vesture's product is found to include the step of "maintaining said component in a heated condition by periodically raising the field strength of said field from a low level to a higher level, and maintaining the field strength at said higher level for a period of time, while said container remains in said operative position."

(5) "said temperature-maintaining step including the steps of detecting an induction heater circuit parameter whose magnitude is at least in part dependent upon the impedance presented by the container when the container is in said operative position thereof, and maintaining the magnetic field strength of said magnetic field at said higher level in response to the magnitude, or rate of change of the magnitude, of said detected parameter"

The court finds that Vesture's product includes a "temperature-maintaining step," as previously defined according to the definition of "temperature controller." The Vesture induction heater maintains the temperature of the food-delivery bag by detecting an induction heater circuit parameter (as previously defined by the court), specifically current, whose magnitude is in part dependent on the impedance presented by the heatable circuit in the bag. Thus, the Vest 400 includes this step.

b. Contributory Infringement

 Under 35 U.S.C. § 271(c): Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for

use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271(c). To prove contributory infringement, § 271(c) requires that an infringer sell a device for use in an infringing process, "which use constitutes a material part of the invention, knowing that the [device] is especially made or adapted for use in infringing the patent," and that the device does not have a substantial noninfringing use. *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 673 (Fed.Cir.1990). The Supreme Court has held that, "[w]hen a charge of contributory infringement is predicated entirely on the sale of an article of commerce that is used by the purchaser [allegedly] to infringe a patent, the public interest in access to that article of commerce is necessarily implicated." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 440, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Defendants argue that Vesture's product has no other substantial non-infringing use other than to keep food warm for delivery. Although it is certain that there are possible non-infringing uses for Vesture's product, "[i]t is not enough . . . that a product or service be physically capable, as it were, of a noninfringing use." *In re Aimster Copyright Litigation*, 334 F.3d 643, 653 (7th Cir.2003). Thus, the court finds that the Vest 400 contributorily infringed TSI's patents under § 271(c).

### c. Inducement of Infringement

▆▆▆▆ Pursuant to 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). In a case of alleged induced infringement, the mov-

ing party "has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed.Cir.1990). "The requisite intent to induce may be inferred from all the circumstances, such as giving a direct infringer instructions on how to use a patented process or designing a product to infringe." *Apple Computer Inc. v. Articulate Sys. Inc.*, 991 F.Supp. 1189, 1191 (N.D.Cal.1997). Defendants allege that because Vesture provides user manuals that specifically instruct the user how to perform infringing methods, Vesture "actively induces infringement" of its patents. Because Vesture does not dispute this fact, the court finds it to be admitted. Thus, the court also finds that Vesture "induces infringement" under § 271(b).

### E. Counts II and III

In Counts II and III of its first amended complaint, Vesture alleges that Defendants tortiously interfered with its prospective business relations and that Defendants committed unfair and deceptive trade practices under North Carolina General Statute § 75–1.1 due to this conduct. There are three aspects of Vesture's interference with prospective business relations claim: (1) an assertion that Defendants improperly represented to Vesture's actual and prospective customers that Vesture's accused food-delivery product infringed TSI's patents; (2) that Defendants made false and disparaging statements regarding Vesture's product to actual and prospective customers; and (3) that Defendants charged Vesture with infringement without proper basis. Vesture's claims are primarily based on three sources of evidence: letters sent to Vesture and others by Defendants; affidavit testimony from Byron C. Owens, Chairman of Vesture,

and Wayne Douglas Baldwin, marketing director and vice president of sales and marketing of Vesture; and internal memoranda from Defendants.

■ On May 15, 2001, the date of issuance of the '585 patent, Defendants sent a small number of letters out to Vesture and pizza vendors advising them of the issuance of the '585 patent. Each "existence of patent" letter sent by Defendants' counsel contained an identical statement:

> We represent Thermal Solutions, Inc. in connection with intellectual property matters.
>
> I enclose a copy of U.S. Patent No. 6,232,585 which has just been issued by the U.S. Patent and Trademark Office. It is suggested that you have your patent counsel review the '585 patent in connection with the manufacture, sale, offer for sale and use of magnetic induction heating equipment used in the pizza industry and in other contexts.

(Decl. of John M. Collins in Supp. Defs.' Mot. for Summ. J. in Connection with Counts II and III of Pl.'s First Am. Compl. for Decl. J., Ex. 5, T04204–08.) In the case of patent notices, federal patent law preempts state tort law. *See Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 896 (Fed.Cir.1998). "The propriety of [a patent notice] depends on patent law and the patent issues to which the notice pertains." *Id.* The court stated that this was true due to "[n]ational uniformity, in confluence with the national scope of the patent grant and the general federal exclusivity in patent causes." *Id.* Furthermore, the Federal Circuit has made it clear that no liability can attach with respect to notice of patent existence letters, or any oral communications to the same effect. *See id.* at 897.

> A patentee has the right to inform a potential infringer of the existence of the patent, whereby the recipient of the in-

formation may adjust its activities, perhaps seek a license, or otherwise act to protect itself. . . . Federal law has uniformly upheld a patentee's right to publicize the issuance of patents and to so inform potential infringers.

*Id.* (citations omitted). Accordingly, all aspects of Vesture's claim regarding Defendant's written notice to customers is preempted and privileged.

■ On October 19, 2001, Defendants' counsel also sent Vesture a notice of infringement letter under two of TSI's patents. (*Id.,* Ex. 7.) Vesture has not introduced, however, any admissible evidence proving that Defendants sent a written notice of infringement to a third party or potential customers. Even under North Carolina law, a claim for wrongful interference with prospective business advantage requires a showing of a "lack of justification for inducing a *third party* to refrain from entering into a contract with them which contract would have ensued but for the interference." *Cameron v. New Hanover Mem'l Hosp., Inc.,* 58 N.C.App. 414, 293 S.E.2d 901, 917 (1982) (emphasis added).

■ For more support, Vesture also submits the testimony of two of its executives. While these two affidavits contain numerous allegations, much of the testimony is inadmissible and will not be considered by this court. Even considering the various statements made in internal memoranda by Defendants (*see* Decl. of Thomas Johnson in Supp. of Pl.'s Mem. in Opp'n to Defs.' Mot. Summ. J. on Counts II and III of Pl.'s First Am. Compl. for Declaratory Relief, Exs. 2–4.), the court finds that Vesture has fallen far short of proving that Defendants had *any* wrongful communications with third parties regarding infringement or Vesture's product.

Assuming *arguendo* that Defendants did contact at least one prospective customer about possible infringement,

Federal precedent is that communication to possible infringers concerning patent rights is not improper if the patent holder has a good faith belief in the accuracy of the communication. Although "bad faith" may encompass subjective as well as objective considerations, and the patent holder's notice is not irrelevant to a determination of bad faith, a competitive commercial purpose is not of itself improper, and bad faith is not supported when the information is objectively accurate. In general, a threshold showing of incorrectness or falsity, or disregard for either, is required in order to find bad faith in the communication of information about the existence or pendency of patent rights. Indeed, a patentee, acting in good faith on its belief as to the nature and scope of its rights, is fully permitted to press those rights "even though he may misconceive what those rights are."

*Mikohn Gaming,* 165 F.3d at 897 (quoting *Kaplan v. Helenhart Novelty Corp.,* 182 F.2d 311, 314 (2d Cir.1950)). Furthermore, a party must prove bad faith by clear and convincing evidence. *See Golan v. Pingel Enter., Inc.,* 310 F.3d 1360, 1371 (Fed.Cir.2002).

Vesture claims that Defendants acted in bad faith and made bad faith assertions concerning any alleged infringement of TSI's patents by Vesture's product. Besides the previously discussed evidence, Vesture also claims that Defendants' inadequate testing of Vesture's product and disparaging comments to the PTO were indicative of Defendants' bad faith. Even if Defendants' testing of Vesture's product in 2001 were less extensive than Defendants claimed, the evidence shows that Defendants tested the product and identified infringement. It is also noteworthy that Defendants' comments to the PTO never mentioned Vesture directly. (*See*

Johnson Decl. in Supp. of Pl.'s Mem. in Opp'n to Defs.' Mot. Summ. J. on Counts II and III, Ex. 12, T00472–473.)

Lastly, Vesture claims that a statement by Corrine Walenda, an employee of Defendants, to a Vesture customer was false and disparaging. Walenda testified that in May 2001 she conferred with an employee at Franke Consulting, which was involved in equipment for new Donato's stores. In an internal email, Walenda stated that "I will await his or Donatos [sic] phone call after six months when all the [Vesture] units have failed and need to be replaced." (*Id.,* Ex. 11 at 105, lines 2–7.) Walenda then testified that she said the comment in jest. Regardless, this single instance does not rise to the level of "disparagement." Moreover, there is no evidence that Vesture suffered any damage from this or any comment regarding its business relations with Donato's Pizza. In fact, Vesture has obtained all of Donato's business and even Vesture's own damage expert, Samuel P. Smith, has testified that the incident "has not played out to Vesture's disadvantage." (Collins Decl. in Supp. Defs.' Mot. for Summ. J. in Connection with Counts II and III, Ex. 2, Smith Dep. at 65.)

Accordingly, Vesture has not sufficiently proven that Defendants improperly communicated to Vesture's actual and prospective customers that Vesture's product infringed TSI's patents or that they made false and disparaging statements regarding Vesture's product to actual and prospective customers. Moreover, Vesture has not proven by clear and convincing evidence that Defendants have acted in bad faith. Thus, the court will grant summary judgment to Defendants with respect to Vesture's tortious interference with prospective business relations claim. Because this claim also forms the basis of Vesture's unfair and deceptive trade practices claim, the court will grant summary judgment to Defendants on both claims.

## CONCLUSION

For the foregoing reasons, the court will grant Defendants' motion to dismiss all claims concerning the '856 patent for lack of subject matter jurisdiction. The court will also grant Defendants' motion for summary judgment for infringement, contributory infringement, and inducement of infringement as to the '585 and '961 patents. The court will also grant Defendants' motion for summary judgment for Vesture's interference with prospective business relations and unfair and deceptive trade practices.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### ORDER and JUDGMENT

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendants' motion to dismiss all claims regarding the '856 patent [Doc. # 113–1] is **GRANTED**, and Plaintiff's claims regarding the '856 patent are **DISMISSED** with prejudice.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff's motion for summary judgment of invalidity and non-infringement of the '856 patent [Doc. # 101–1] is **DISMISSED** as moot.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff's motion for summary judgment of non-infringement of the '585 and '961 patents [Doc. # 104–1] is **DENIED**, and Plaintiff's claims concerning non-infringement of the '585 and '961 patents are **DISMISSED** with prejudice.

IT IS FURTHER ORDERED AND ADJUDGED that Defendants' motion for summary judgment for infringement of the '585 and '961 patents [Doc. # 93–1] is **GRANTED**.

IT IS FURTHER ORDERED AND ADJUDGED that Defendants' motion for summary judgment in connection with Counts II and III of Plaintiff's First Amended Complaint [Doc. # 98–1] is **GRANTED**, and Counts II and III are **DISMISSED** with prejudice.

IT IS FURTHER ORDERED that Defendants' motion to exclude evidence and contentions allegedly supporting Counts II and III of Plaintiff's First Amended Complaint [Doc. # 90–1] and to dismiss Counts II and III [Doc. # 90–2] is **DENIED** as moot.

IT IS FURTHER ORDERED that Defendants' motion to strike [Doc. # 130–1] portions of the declarations of Byron C. Owens and Wayne Douglas Baldwin is **GRANTED**.

IT IS FURTHER ORDERED that Defendants' motion for immediate status conference [Doc. # 165–1] is **DENIED** as moot.